DAYTON ENGINEERING LABORATORIES CO. et al. v. SIDNEY B. BOWMAN AUTOMOBILE CO.

(District Court, S. D. New York. February 25, 1915.)

No. 10–265.

PATENTS ⬤➡328—VALIDITY AND INFRINGEMENT—STARTER FOR MOTOR CARS.
    The Coleman patents, No. 745,157, claims 3, 7, 12, 17, and 20, and No. 842,827, claims 2, 3, 7, and 9, each patent being for automatic starting system for motor cars, *held* not anticipated and to disclose invention. Such claims of the first patent *held* infringed, and of the latter patent not infringed.

In Equity. Suit by the Dayton Engineering Laboratories Company and Conrad Hubert against the Sidney B. Bowman Automobile Company. Decree for complainant on one cause of action, and for defendant on the second.

Drury W. Cooper, J. B. Hayward, and Thomas J. Byrne, all of New York City, for complainants.

Edmund Wetmore, of New York City, and Davis & Dorsey, of Rochester, N. Y., for defendant.

SANBORN, District Judge. Infringement suit on patent No. 745,-157, applied for February 11, 1901, issued November 24, 1903, and No. 842,827, applied for February 11, 1901, issued January 29, 1907, both running to Clyde J. Coleman. The claims in suit of the first patent are 3, 7, 9, 12, 17, 18, 20, and 24; of the second, 2, 3, 7, 9, 19, and 26.

Complainants produced evidence tending to carry the actual date of Coleman's inventions back at least to the "Dewey Land Parade," which was September 30, 1899, long before the effective dates of two supposed prior art patents to Lanchester, which were sealed, respectively, July 25, 1900, and November 28, 1900.

The automatic car-starting apparatus of complainants is called the "Delco," and defendant's device the "North East," because it is made

by the North East Electric Company, of Rochester, N. Y. The complainant corporation is herein referred to as the Delco Company, and the manufacturer of defendant's device as the North East Company. The Delco output from 1911 to 1915 has been about 200,000 starters, used on 10 different types of cars.

Each of the patents covers part of an automatic starting system for motor cars. Broadly considered, both patents require the combination of (1) an engine; (2) a prime-mover, which shall be capable of transforming potential energy, of some form, into kinetic energy, or power to start the engine, and also of the reciprocal function of transforming power, derived from the engine, into potential energy; (3) mechanical connections between the engine and the prime-mover, for the reciprocal transfer of power between them; (4) energy-storing means of some kind for receiving energy from, and returning it to, the prime-mover; and (5) connections between the prime-mover and the energy-storing means, these connections depending, for their character, upon the nature of the energy by which the prime-mover is operative. In both patents the characteristic features of the apparatus lie in the connections just referred to, and the distinction between the patents resides in the fact that in the earlier patent it is the connections between the prime-mover and the engine which are involved, while in the later patent it is the connections between the prime-mover and the energy-storing device which are involved.

Both patents show in their drawings a motor-dynamo as the prime-mover, and a storage battery, with the motor-dynamo acting first as a motor to start the engine, and then as a dynamo, run by the engine, to convert mechanical to electrical energy to recharge the battery. But in their specifications and claims these patents show inventions of broad scope, not limited to electrical means, but including the utilization of any form of energy. In this way the prior art is brought in, not only as to storage batteries, generators, and motors, but also as to compressed air and spring devices.

No successful starting apparatus has ever been made which was distinctly under the Coleman patents. It is true that in 1901 a starter was rigged upon a Brewster runabout and used for two weeks, but it was not made strictly in accordance with either of the patents in suit. Mr. Kettering, for the Delco Company, developed its starter before it ever heard of these patents, and was then advised by its attorneys that the apparatus would, in their opinion, infringe these patents. Licenses were then obtained. What is true of Kettering holds good for the North East Company, through its engineer, Halbleib. These men attacked the problem at nearly the same time, and each produced a successful and practical apparatus without knowledge of the Coleman disclosures.

In a general way Coleman's inventive idea was to so connect an engine and electro-magnetic machine that each was adapted to actuate the other, and to put them on a motor car. This had been done in different ways by half a dozen prior inventors, but Coleman was, of course, at liberty to improve on their work by adopting forms of his own. For this purpose he took out the two patents in suit, one in which

the mechanical idea predominates, the electrical in the other. The main idea of the first patent is the differential gear and clutch mechanism between motor-dynamo and engine; of the second, the change of intensity in the magnetic field of the motor-dynamo from an intense field in starting to a weaker field in charging.

In approaching the problem on its electrical idea Coleman was unfortunate in discarding all the prior art as to variable speed lighting. Charging a battery with a constant speed dynamo is quite a simple thing compared with the variable speed problem. As Mr. Waterman, testifying for defendant, says:

"The variable speed problem is enormously more difficult. It is more difficult to comprehend, to get into the mind, and it is infinitely more difficult to design. When, therefore, a man wants to design a device which shall, operating under widely varying speed, act to charge a storage battery with due regard to conditions of safety to the battery which are imposed, he does not go to a source of information regarding constant speed control. On the contrary, if he is wise, he tries to forget all that he ever knew about constant speed control, and he goes to the arts which have developed variable speed control, and rearranges his ideas, because they have to be essentially rearranged to the altered conditions of variable speed operation."

This matter had been worked out in 1901, when Coleman filed his applications. Testifying for complainants, Mr. Bentley says that the constant current system of train lighting now in general use dates from 1900, when the first system was put in, which was more or less of an experimental apparatus, but was the present system.

While there are important differences between train lighting, including battery storage, and automobile starting and battery storage, yet the real problem was not, as Coleman conceived it, to use a constant speed engine, and switch in the dynamo only when full normal speed was reached, so as to keep the dynamo-speed constant. That was not the problem solved by Kettering and Halbleib, and has only a distant relation to it. The real difficulty, and in 1901 no doubt a serious one, was to utilize the variable dynamo-speed train lighting system to the variable speed engine and dynamo. Coleman did not address himself to this question; he either dodged it, or thought he could get something better in his own way.

Under the first patent the operation may be thus described: Having equipped the car with an explosion engine, storage battery, motor-dynamo, differential gearing connecting them with the engine, and a centrifugal governor to control a switch for opening and closing the electrical circuit, his starting and charging operation is this: By a hand-lever the operator closes the circuit, by the same movement opening the fuel supply, and closing the sparking circuit. Current flows from the battery to the motor, through a wiring so arranged as to enable the motor to revolve rapidly, and send a large torque or turning power through the differential gearing to the engine-crank. Assuming that the engine has started, the condition contemplated by Coleman is quite different than at the present time, because he is to use a constant speed engine, which must reach its full speed as soon as possible after starting, since the fuel is all turned on, and there is no need for any throttle. Therefore he leaves the hand-lever in its initial position until the engine is well started, then puts it in its second position, thus

breaking entirely the electrical charging circuit, and throwing the disk-clutch into registry, and so connecting the engine and driving gear. The motor-dynamo remains out of circuit until the engine reaches its normal speed, and this rate of speed spreads the arms of the governor and makes them close the circuit again. During the period that the circuit has been broken the revolutions of the engine, by means of the differential gearing and overrunning clutch-mechanism located on the motor-shaft, have been turning the armature in an idling way, since there is then no current to energize either the series field or the armature shunt, thus producing little or no electro-motive force. But as soon as the governor closes the circuit at full engine speed the current now flows from the motor-dynamo acting as a generator in the opposite direction around the circuit to the battery and thence through the field, and also shunts through the armature brushes, thus charging the storage battery. As soon as the engine speed is cut down, either by loading or cutting off the fuel, the governor opens the circuit, and all electrical operation ceases. Mr. Waterman sums up the matter by saying that Coleman took the old shunt-dynamo of the time, with its old constant speed engine, and put them on an automobile without alteration. He thinks this was not a forward step.

Mr. Waterman also gives another reason why he thinks the first patent to Coleman was not an addition to the electrical art; that is, that the centrifugal governor is not only unnecessary, but a positive detriment, because it allows the charging operation only to go on at high engine-speed. This is explained by the much-repeated statement of fact that a dynamo and a motor are one and the same thing in structure, the only distinction being in result. When electrical force is used to drive the device to produce mechanical force it is a motor; when mechanical force is used to turn the armature and produce electro-motive force it is a dynamo. Thus in the above description the motor, actuated by battery-pressure, turns the engine-crank, starts the explosions in the cylinders, they in turn drive the engine, and the latter, through the differential and overrunning clutch-gearing, drives the motor, which then begins to give out electro-motive force as a dynamo. When this dynamo pressure or voltage exceeds the battery voltage, current begins to flow into the battery, and the charging operation begins. The two operations run smoothly into each other. The battery-charging depends on the needs of the battery and not on the engine speed. This change from one operation to the other was well known before Coleman entered the field, as shown by many prior patents for lighting systems. Therefore the use of the unnecessary centrifugal governor was a step backward, not forward.

Not only did the inventor fail to appreciate the generator operation immediately following the motor operation, without stopping, but he describes the charging current flowing in the same direction as the starting current. Of course, the charging current into the battery must be the reverse of the starting current flowing from the battery; otherwise, the battery would be both giving up current and receiving it at the same time. This is possibly only a mistake, however, and a similar one was corrected in the description of the second patent, at the suggestion of the examiner.

*Date of Coleman Invention.* On the trial Mr. Coleman was examined as a witness. In order to show the actual date of his invention he produced three sketches made in 1899, marked C–1, C–21, and C–4. The first one is dated April 20, 1899, being the date when it was left with Coleman's attorney in Chicago. It refers wholly to electrical circuits and apparatus, without any suggestion of gears or clutches. It was not intended to show any complete or operative structure, as Coleman states in his testimony. By the rule of Moline Plow Co. v. Rock Island Plow Co. (in the Seventh circuit) 212 Fed. 727, 129 C. C. A. 337, to the effect that a prior drawing or model must be sufficiently plain to enable one skilled in the art to understand the invention, this sketch C–1 is not sufficient. It was not intended to be more than a suggestion of something to be worked out later.

Exhibit C–21, like the others, is a rough pencil memorandum, but its explanation is somewhat elaborate. It contains two generators, one very small, whereby the voltage of the other was to be kept constant. This feature not appearing in either patent, it seems clear that the patentee's scheme had not yet been completed. The sketch shows no switches or governors, simply a battery, two motors, and connecting wiring. The writing on the sketch, however, is much more complete, but still not absolutely so. Coleman says this was made before July 20, 1899, and contains instructions to a draftsman (Mr. Cravath) "to make a working drawing of these different suggestions and instructions." The written matter in part reads thus:

"Then also let him lay out full dimension drawings for motor-generator—better figure on about 15 watts on shunt field winding when engine is running generator about 1,000 r. p. m. Think safe to figure on high speed of engine being 800 r. p. m. Of course, field current will then be less—proportionally as speed of engine and generator are higher. Lewis' engine was I believe 600 revolutions and 5″ diameter by 5″ stroke and with full charge about 50 pounds when compressed. Put shunt coils of field on core nearest armature, so as to get best efficiency when it is generating current to recharge batteries, and the series coils on field can come right up against the inside of field ring and back of shunt coils—use both shunt and series field coils for starting engine. Find out if Roth Bros. have a frame about right size that we can wind for this outfit. Let me know when this is all laid out, and I will give you my ideas about switches for starting and control. Think perhaps better figure on six cells of storage battery, same as these copper oxide battery jars, only about one half as high and, of course, of hard rubber. If we could get some plates from Haske, same size as used in burning battery, could saw them into four 6x6 plates and burn lugs to them. (Generator 100 watts.) (Starting current 500 watts.)"

It will be noticed that the conception was still incomplete as to "switches for starting and control."

The last sketch and explanation, C–4, was made on a large envelope shortly before the Dewey Land Parade in New York, which was September, 30, 1899, and the drawing was shown to four people on or about that day. It shows that Coleman's idea had become much more definite than in the other forms, and contains a rough suggestion of a motor vehicle, a gas engine, a controlling lever or handle, two field windings, one heavy and one light, the latter connected in series with a centrifugal governor, called a governor circuit closer and automatic control, a dynamo with brushes and commutator, field and shunt windings, a chain drive connecting motor and engine shaft, and an auto-

matic clutch on the dynamo-shaft with a planetary gearing, which means literally one gear wheel meshed with another and traveling around it, planet fashion. The accompanying description reads:

"Take out two patents, one using dynamo and motor separately, so motor will have different gearing leverage or torque connection with gas engine of automobile from the dynamo, which must run slower; could use electric clutches to connect one or the other as required. Other case to have both effects combined in one apparatus. The shunt winding on field is to be used when engine is running electric motor or generator as a dynamo to charge batteries, and the series winding is to be used to increase the electrical torque when gearing is thrown in so as to give motor enough leverage to start gas engine. Use two ratchet clutches on same idea as my electric street car motor with revolving field and armature. In the hub of gas engine or electric generator sprocket is a set of ratchet or coaster brake style clutches and a set of reducing gearing so placed to give electric motor enough torque to rotate gas engine to start it, and when engine starts and runs ahead the second clutch takes hold so engine will run dynamo slower and safe speed; first clutch and gearing is idle at this time." .

Coleman street car motor is shown in patent No. 516,916, of 1894, claim 7 of which reads thus:

"A motor having its field and armature adapted to rotate in opposite directions, gearing connections of a differential nature between each of the same and the driven shaft, and clutches for independently engaging and holding the field and armature from rotation, said clutches having a common operative connection, so that the application of the one will release the other, substantially as set forth."

Mr. Coleman thus explains the connection:

"Q. What physical change would you have to make on the gears shown in that street car motor patent, and, for example, I will ask you with reference to Fig. 2 what change you would have to make—to adapt those gears to the use on the sketch Exhibit C–4? A. In relation to the other clutch, you would only reverse the clutch relation; that is to say, the clutch engagement direction, so that it would be adapted to either the engine locking through one set of gearing to actuate the dynamo, or the other clutch operating through the other clutch to actuate the engine at the ratio of gearing to which it was associated with."

It is obvious that there is nothing in any or all of these sketches and written explanations which brings the electrical connections between the dynamo and storage battery within the rule of the Moline Plow Case, or within Judge Coxe's statement of the rule in Thayer v. Hart (C. C.) 20 Fed. 693. As to these connections there is no reduction to practice—no complete mechanism whatever. The general idea is there, but no practical result. How is the battery to be connected with the motor? At what speed is the centrifugal governor to start the charging? Is the engine to be of the stationary or variable speed type? How are the series and shunt-windings to be made? No doubt some of these questions might appear easy of solution to a skilled electrical engineer, but where is the reduction to practice? Under the strict rule governing the proof of anticipation, is it not clear that none of these sketches or explanations is sufficient?

As to the differential connections between motor and engine and the latter and dynamo the case is different. Coaster brake clutches and reducing gears are mentioned, and the drawings and explanations in Coleman's patent 516,916, referred to in C–4 (although intended for

a different purpose), are sufficient, taken together, to enable a skilled workman to so apply the clutches and gears as to obtain the differential ratios desired. I think a sufficient reduction to practice is shown. This conclusion, however, makes it evident that the first patent, covering the differential, although clearly valid as a combination, was not broadly new after the disclosures of Gibbons and Wilcox and those of the Coleman patent 516,916. Indeed, it seems obvious that, after the suggestions of claim 7 of the latter patent are in mind, it becomes simply a matter of experiment with gears and overrunning clutches to reach the result of Coleman, Kettering, or Halbleib. On this basis the Coleman patent, covering a certain form of differential, might be novel, and so might Kettering's and Halbleib's forms, if sufficiently distinguished. The date of the invention of the first patent should therefore be September 30, 1899.

*The First Coleman Patent.* The leading idea is the differential gear arrangement with overrunning clutches, located between motor-dynamo and engine-crank, so constructed (as the patentee says) "that the motor-dynamo drives the engine at one ratio of speed, and the engine when self-actuated drives the motor-dynamo at another and different ratio of speed." This description verbally fits the North East system, the only differences being that the patent system is not so efficient as the other, and does not clearly provide against back-firing. Without describing this differential arrangement in detail, it is enough to quote a claim in an application of Mr. Halbleib (who had to do with designing the North East system), and which was rejected on the first Coleman patent:

"Claim 5. Engine starting apparatus having in combination an electric device adapted to operate either as a generator or as a motor; means for connecting the electric device with an engine, including a one-direction clutch adapted to transmit power from the engine to the electric device when the latter operates as a generator, but to permit the electric device to overrun the engine when the electric device operates as a motor, and reduction gearing; and a second one-direction clutch for connecting the electric device when operating as a motor to actuate the engine; said second clutch being adapted to permit the engine to overrun the reduction gearing."

The gearing ratios in Coleman are 5 to 1 and 1 to 1, and in the North East machine the ratios are 29 to 1 and 1 to 2, respectively.

It is obvious that Coleman was careful not to confine his claims to any kind of power; so, of course, all similar power devices of the prior art are pertinent. With a spring as the prime mover, and differential gears and clutches, a similar device is shown by the Gibbons and Wilcox patent 581,816, of 1897; also in Strong, 597,921, January 25, 1898. I omit the English patents to Lanchester and the United States patent to Melvin, because I think Coleman's date of invention of the differential gear was prior to any of them.

Counsel for defendant in their brief say that it is not denied that, if the claims sued on in the first patent are valid, some of them would be infringed by defendant's machine. In his testimony for defendant Mr. Waterman says:

"Referring to the defendant's apparatus, the apparatus differs from the Coleman apparatus in every respect except that it employs a differential gear arrangement with overrunning clutches. That arrangement shown by Mr.

Coleman seems to me to be an extremely ingenious one, unfortunately embodied in an impractical form. In the defendant's apparatus it is embodied, if the two are held to be alike, in a practical form, in that the gears are both of the positive type, and the clutch mechanism which permits back-firing is put into one of the gears. The defendant's device is practical in other ways, where the Coleman device is impractical. Of course, to run exposed gears in that way without lubrication would be, while not inoperative at the start, impractical, in that it would soon become inoperative. The noise, also, would be prohibitive, because these gears run all the time. The gears 9 and 11, for instance, which are actually used only in starting, are nevertheless running all the time; and the prime necessity, therefore, is that they should be continuously lubricated and inclosed, and that, of course, is prohibited where the friction gear is present, because the friction gear would be inoperative in the presence of such lubrication. In all that which goes to the embodiment of the structure in a usable form the defendant's gear is different; but in that it involves the use of overrunning clutches, giving two speeds, it seems to me that it is very much the same."

While defendant's differential arrangement differs in detail and improves upon Coleman, it is substantially the same conception, and infringement should be found. The defects on the electrical side have no effect on the differential. Coleman was not the first to use a differential, but his conception was novel, and he gets a better result.

*The Second Coleman Patent.* This application was filed with that of the first patent, February 11, 1901, which must be taken as the true date of invention in this case. The patent supplements the first (which covers chiefly the differential connections between motor and engine), by covering electrical storage means connections between the engine and battery.

Like the other, this patent is not designed to improve the automobile. It shows no transmission clutch, nor throttle, the engine has only one speed, gauged as the proper one to store the battery, and the engine must be stopped every time the car is. The motor also starts the car every time it starts the engine. Mr. Waterman says:

"In other words, again, in this patent, Coleman did not solve the automobile problem; he did not even attack it. He entirely dodged it, by taking the stationary engine practice, namely, the use of a constant speed engine, notwithstanding the fact that in doing that he had to sacrifice all controllability of the automobile. He simply put the stationary engine charging outfit onto the automobile and used it with its well-known functions."

Change of field intensity between starting and storing is the gist of this patent. Several of the claims in suit provide:

"A field of great intensity, as a motor, to start the engine * * * and a field of less intensity, as a dynamo."

The general difference between the two patents is thus described by Mr. Bentley:

"The general purpose of the organization in this patent No. 842,827 is the same as that in patent No. 745,157, but it accomplishes that purpose electrically instead of mechanically; that is to say, Coleman aims when the electrical machine is acting as a motor to start the dynamo, to give a very large torque or turning force to the motor. In the patent No. 745,157 he did this mechanically by means of gearing, which gave the motor a large leverage over the engine shaft. In patent No. 842,827 the electrical machine at the time it acts as a motor has a special electrical organization, so that it will have a very strong field-magnet and have a greater torque electrically, corresponding to the greater mechanical torque, which it would have had by the mechanical

arrangement of patent No. 745,157. Similarly, when the machine acts as a dynamo to charge the battery, it is to have a weaker field-magnet, and therefore have less charging electro-motive force, or be a weaker machine, just as in the former patent it was made weaker by means of the gearing."

In other words, by the first patent it is immaterial what kind of power drives the motor, the important point being its speed. The work is mechanical, depending merely on the fact that the motor runs fast and the engine much slower. In the second patent the work is electrical, through the field magnet of the electric motor.

In operation the device is designed to act somewhat as follows: A battery, motor-dynamo, and electrical connections are provided. The motor-dynamo shaft is belted to the engine shaft, so as to drive the latter one-seventh as fast as the former, without change of ratio. To start the engine and car an operating lever is pushed in, to fully open the fuel valve and close the electrical circuit. Current flows from the battery to multiple windings of the electro-magnet, so as to produce an intense field and get a strong starting torque or turning effort; part of the battery current being carried to the armature. The electrical machine now acts as a motor with a strong magnetic field, and turns the engine-crank slowly until it starts, at a ratio of about seven turns of the dynamo-shaft to one of the crank-shaft. The engine speeds up and the motor continues to operate, being impelled both by the battery current and the engine, now running on its own power. About the time the engine reaches normal speed, the accompanying armature speed opens a centrifugal governor located on the opposite side of the motor dynamo from the engine shaft; the governor shifts the contacts of a switch in the electric circuit and reverses the current. As the engine is now propelling the armature, the electrical machine now begins to act as a dynamo; current flows therefrom back to the battery, thus charging it. How the weaker field is now obtained, so as to get a lower charging rate, is described by Mr. Bentley as follows:

"Now, we have the two fields working together; but in this case the dynamo is the source of energy, and it is opposed by the voltage of the battery, so that the effective voltage of the electro-motive force is a differential between that of the dynamo and that of the battery. It is only the excess of the dynamo voltage over the battery voltage which now causes the current to flow in the circuit; that gives a very much lower voltage, so that we have a very much lower voltage magnet strength for the dynamo during the time that it is working in charging the storage battery."

Mr. Waterman thinks it is nonsense. He says:

"In so far as he has arranged his electrical connections, in other words, he has done his best to defeat the object. The structure is wholly absurd. I have no hesitation in saying that it is inoperative. I want to be entirely fair about it. If there was anything else that I could think of to say in its favor, I would. It is unintelligible from an electrical point of view, and unintelligible from a mechanical point of view. The only possible way of assuming it to be operative at all is to assume that by virtue of the governor the charging rate would be small, just as it always had been small under those circumstances; it would be anything that you set the governor for. If that was what the patentee meant, I think he should say that the governor should have been set so that it would attain that result, because the statement which he makes, unless interpreted with much allowance and piecing together of things for him, is nonsense."

The patent, however, must be held to show an operative design, because an alternative operation is given in the patent (Figure 3), which seems to give a weaker field for storing. The criticism of this plan, that the operation would destroy the armature, is, I think, cleared up by Mr. Bentley, where he says this result would not occur in a small machine.

Assuming the structure to be operative, the gist of its action is that the battery energizes the motor to start the engine with a large torque; the governor reverses the current; then the motor becomes a dynamo with a weaker magnetic field, and charges the battery under those conditions.

Comparing the operation of the North East apparatus with that contemplated by the second Coleman patent, great differences appear. The starting switch, when swung to the left, contacts on two points. As it passes the first, the full force of the magnetic field is thrown in, being the shunt field added to the series field, by which a large torque is momentarily applied. This gives a slow movement to the crank-shaft, not sufficiently fast to surely start the engine. So an intermediate step is now unconsciously taken, through the swinging of the switch past the first to the second contact. The series field is now short-circuited, leaving only the shunt field in operation. This speeds up the armature, and crank-shaft geared to it, continuing on with the weaker field, but much quicker speed. When the engine starts the switch is manually released and flies back to its normal position, and the intermediate or noncharging period is reached. This stage need not be described further than to say that, when the battery voltage has been overcome by that of the electrical machine now operating as a generator, motor operation has been thrown over to generator operation, and the current reversed. The engine has overtaken the armature shaft, the latter gripped by the overrunning clutch-member, and now driven entirely by the engine, and the charging operation nearly reached.

The generator pressure, though now somewhat higher than that of the battery, is not high enough for charging, because the current from the generator towards the battery runs through a fine wire shunt resistance-coil of about 235 ohms connected with a switch called "automatic switch No. 1." This high resistance keeps the current very low, until it can be cut out. When the pressure of the generator reaches 30 volts switch No. 1 closes. The closing of the switch short-circuits the resistance, and the charging period is now reached. The engine has now reached about 500 r. p. m. (revolutions per minute), and this switch will open when that falls to 350 r. p. m. and the charging ceases.

The charging operation occurs in this way: Current flows from the generator through the series and shunt field through the battery back to the opposite side of the generator, with a weakened field strength, regulated also by another switch called "automatic switch No. 2," which need not be particularly described, except to say that it opens and closes to maintain constant charging conditions. The weakened field results from the series field and shunt field opposing each other, while in the first stage of the starting it will be remembered they were

assisting each other.   This "bucking" comes from reversing the current, which now goes through the series field one way, and the shunt field in the same direction as it did before, just as a person entering his front gate from the street goes in the same direction, no matter from which way he approaches the gate.

Obviously this is a very different operation from that of the second patent, although the broad claims calling for field intensity in starting and a weaker field in charging may be read upon it.   If Coleman was the first to grasp this fundamental conception of the modern starter, infringement might be found.

*The Art Prior to 1901.*   Ten years before Coleman applied for his patents, Patton devised his electric street car shown in his patent No. 475,702, issued May 24, 1892.   In his description he says:

"I utilize the dynamo as a motor for starting up and running the gas or analogous engine or motor until the speed of the engine is such as to drive the dynamo at a rate of speed sufficient to convert it into a generator. The dynamo is thus primarily supplied from a storage-battery, and as a convenient, economical, and effective arrangement I supply the dynamo from a storage-battery which in running the car is employed as an auxiliary and adjunct to the dynamo, as hereinbefore set forth. When, therefore, the dynamo and electric-motor circuits are open and the engine is at rest, the dynamo can be started up as a motor by placing the storage-battery in circuit connection with the dynamo, whereupon the dynamo will at once run as a motor and start up the engine. As soon, however, as the engine attains a proper rate of speed, it will so increase the speed of the dynamo as to convert the same into a generator, whereupon the dynamo will supply back the storage-battery, and the two will be in readiness for supplying the electric motor."

No change of field intensity was thought of in this patent.   This was apparently the first electric starter, and was used in Pullman, Ill., in 1890 or 1891.   Along the same line is the Washburn patent of 1895, No. 550,008, which also shows Coleman's fundamental idea. A rheostat is shown, which the patentee says is to regulate and predetermine the amount of current delivered to the storage battery.

The notion of change of field intensities is claimed by Mr. Waterman to be present (though not expressly described) in the Greengrass English patent, No. 26,302, of 1896, because a compound wound motor is employed, which would have a field of less intensity when the current is reversed for charging, as described in the patent.   Counsel for complainants point out that, as the electric machine is as large as the gas-engine, no intense field would be necessary; also that the patentee had no such idea, because he says a "shunt or compound wound motor" could be used.

In the Clubbe and Southcy English patent, No. 11,053, of 1896, there is a starting and storing apparatus with a reversing switch.   The motor-dynamo is to have a shunt winding, and there is no suggestion of a change of field intensities.

But in the Munson United States patent, No. 653,199, issued July 3, 1900 (applied for May 16, 1898), this notion is expressly provided for.   He says he uses two sets of field windings, used separately to constitute the machine either a motor or a dynamo, and traces the motor circuit through the field windings, and the dynamo circuit through the shunt field windings.   Both are clearly shown in the diagrams.   It is true that Munson and Coleman were working at different

problems, and that the former does not strictly anticipate the latter; but it is certainly true that Coleman did not originate the broad, fundamental idea of the great value of the change of field intensity, which is clearly present in Washburn and Munson.

*Infringement of Second Patent.* Six claims are in suit, one of which follows:

7. The combination—
    1. Of an engine and an electric motor connected together so that each is adapted to actuate the other.
    2. Electrical storage means.
    3. Means for connecting the motor as a field of great intensity as a motor, with the storage means to start the engine.
    4. Means for connecting the motor with a field of less intensity, as a dynamo, with the storage means.

No doubt this claim reads on defendant's apparatus, not quite accurately as to the field of great intensity to start the motor, because defendant's field is normally cut down to the shunt field while the motor is starting. The claim reads almost equally well on Munson, and is thus much too broad. Coleman conceived that a strong field for starting and a weaker field for charging would be useful, and described two ways for getting results. Others had preceded him in the same idea, and had described the forms in which they proposed to embody it. Complainants and defendant also at a later time designed other forms for carrying out the same idea. Defendant does not use Coleman's forms, or either of them; the two are widely different. Not only this, but defendant adopted well-known forms of windings, resistances, and switches which antedated Coleman, and did this without any aid from him. These forms are quite similar to Lewis, No. 516,496, and particularly Creveling, No. 644,409, issued February 27, 1900.

Washburn had the right to claim this variation of field intensity, because he was the first to discover it; but Munson and Coleman each had the right to his own form of how the idea should be carried out, so long as they did not trespass on any valid patent rights. Coleman adopts one form, defendant another. "The latter is not a mere colorable departure from the form of Todd [Coleman], but is a substantial departure." Duff v. Sterling Pump Co., 107 U. S. 636, 2 Sup. Ct. 487, 27 L. Ed. 517.

There should be a decree sustaining the claims 3, 7, 12, 17, and 20 of patent 745,157, and declaring these claims infringed; also sustaining claims 2, 3, 7, and 9 of patent No. 842,827, but declaring this patent not infringed. There should not be costs for or against either party. The decree should also provide for an injunction and accounting under the five claims of the first patent referred to.